Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is number 162468 United States v. Akeen Ocean and number 171183 United States v. Jermaine Mitchell. Thank you. Thank you. Thank you.  My name is Merritt Schnipper. I represent Akeen Ocean. May it please the court. There's plenty of evidence in the record here that the defendant obtained crack cocaine from members of the conspiracy and redistributed it to his own customers. But what's lacking in the record is evidence of his subjective intent to endorse larger aims of this conspiracy and to participate in its mechanisms of operation. In fact, the record shows that he was markedly hostile to the way that the larger operation proceeded to expand and build its business. And he saw that process as inimical to his own more narrow interests of maintaining his customer base and maintaining the supply of cocaine that he needed to feed his own addiction. So what we're really claiming here is that the necessary interdependence to convict him of a conspiracy charge was lacking. He was actually residing with one of the upper-level fellows, as I recall. What happened is that he had a sometime girlfriend that he would stay with. She installed or accepted this upper-level fellow, Ramirez, the primary. And this conduct went on for at least 18 months? I think for this defendant, it was about a year that he was associated with the conspirators. But the residence of Ramirez in his girlfriend's home, where Mr. Ocean was only a coming and going presence, I think was about six months. So for 18 months, he's getting the narcotics from someone. He's doing the deal. He's selling them. Right. So there's no doubt he's participating in a branch of the conspiratorial venture. Sounds like he's in the conspiracy. Well, what he is is he's in the drug dealing business. And he's in the business of maintaining his own supply for his own reasons. But I think when you look at the way this conspiracy functioned at a larger scope, because what it did was it moved into town from New Haven. It found a whole bunch of local addicts to use as middlemen distributors. And then as those middlemen brought their customers closer, it directly appropriated those customers and moved those local addicts into support roles as couriers and people to provide housing distribution locations and the like. And the defendant is markedly the only local addict figure in this case who resisted and indeed expressed objections to that mode of operation. So it's clear that he saw it with some level of hostility. Now, there are lots of cases from the circuit saying that competition or conflict within a conspiracy does not undercut a finding of interdependence. But that's only when the evidence shows that sort of the rising tide of the conspiracy lifts all boats. So that they may be competing against each other within the realm of the conspiracy, but they're not looking at it as a zero-sum game because everybody's going to gain if the organization of which they're part builds its sails. But that's clearly not the case for this defendant. How did his objections cut for you? Because if he objects to certain aspects of the conspiracy, and if those objections themselves are rejected by the other conspirators, and then he continues on month after month after month still participating with full knowledge of all the aspects of the conspiracy to which he's previously objected, don't you get to a point where you can infer that his continued participation was implicit acceptance? Well, I think what you can get to the point of is that he basically was trying to negotiate a narrow line on which he could maintain what he needed for his own narrow parochial interests, or to maintain a supply of crack, both for his own addiction and to feather his own pocket a little bit. But then he knew that any time he moved closer than a certain distance, he would end up having all his customers taken away and he'd be left out in the cold because he was neither interested in nor capable of providing them with the support services that they required of the people who ended up in that situation. So he didn't have a car. He couldn't drive them to New Haven to resupply. He couldn't assist them with straw purchases of firearms. He didn't have a house to bring them into, or he was certainly unwilling to do that. He berated his girlfriend when she ended up in the situation where she was marginalized by them. And as the government pointed out in his closing, he was too smart to fall into that trap. Whether that's a sign of intelligence or just simply sort of looking out for his own narrow interests, it's certainly clear that he stands alone within this group by that behavioral pattern. I mean, he's the only person whose name and contact information is not found in the cell phones that are taken from co-defendant Mitchell upon his arrest. He's the only person who never participated in any of these other support roles. And each of the testifying co-conspirators, you know, Ramirez is sort of an upper-level fellow, and all the other people who occupy the same level as Ocean, basically, you know, they told the story. I bought crack once or twice from these low-level people. I met the main fellows, and the next thing I knew, I was incorporated into the ongoing enterprise. So I think what really sets him apart is that he was fighting, and apparently successfully throughout the time before the main conspirators' arrest, to maintain his separate sphere. When you say fighting and objecting, who's he objecting to? What's the evidence on that? Well, we have direct evidence of his state of mind when he's interviewed by the New Haven police officers, and he says, you know, I never participated. He actually gives a little narrative of his own participation. I just got my crack and kept it going. I didn't hang with those guys. I didn't run with them. I didn't drive them. I didn't live with them. So there's that. There's Thetonia, his immunized girlfriend, talking about how he was, quote, madder than hell every time she would bring people over to the house. There's Thetonia's recitation of his own statements that he was making sure that he didn't end up marginalized by her. You know, he's griping to his girlfriend about it, and he's unhappy with it, but he's not really objecting, and he's continuing to, you know, get the drugs from these other people. Well, he's walking an arrow line because they have something he needs, and he's trying to maintain that connection. But, I mean, what I really say to the court is that there's ample case law from this circuit saying that you can interact with a branch of the conspiracy and even participate in some of his ventures without indicating agreements to the larger undertaking. You really have to look to the indicia, such as it is in the record, of the defendant's subjective state of mind in order to make that assessment. I'd like to move briefly to the Messiah question, if I could, and specifically to point out what I think is an important distinction between cases involving jailhouse informants, in which the express direction requirement that was applied by the district court here both exists in this court's case law and makes some sense, and a case where a coparticipant in the underlying crime and a person with a pre-existing relationship to the indicted and represented defendant is the person who acts to obtain the incriminating statements, because in that latter situation, which is what we have here, we don't have express direction. What we have is a pre-existing relationship the government was able to take advantage of, because you have a person who's incarcerated under the government's motion. He has a previously existing connection to an immunized witness. He's placed in a position where he's reaching out for support, as the Supreme Court said in Henry, a significant consideration in the Messiah inquiry is whether or not the person's incarcerated and cut off from their support system. And then what you have is a person who visits him in jail because of their pre-existing relationship, when he clearly knows that she's immunized, but he says to her, you know, at this point you're in the clear, you're already immunized, they can't take that away from you, what you need to do is go to court and either not appear at all as a witness at trial or appear and say I didn't have anything to do with it. And she sits there and says, yes, you're right, I know you're getting, you know, wronged by this prosecution, they're misrepresenting you. I mean, she's basically holding herself out to him as a sympathetic ear and exactly the type of sort of listening safe harbor that the Henry court certainly talks about as being the danger. So are you saying that any time the government gives any immunity to a person who has a pre-existing relationship with the target or the defendant, that the government must instruct that person not to go talk with the defendant? I do think that's the implication of Messiah, because I do think Messiah basically holds out the totality of the circumstances, situation. It talks about governmental creation of a situation likely to produce incriminating statements. I think it's pretty clear from the Messiah cases in both these circuits, I'll just finish if I could, and from the Supreme Court that there's a wide variety of circumstances from direct interrogation by police officers to the defendant reaching out to his co-participant in the crime and saying, hey, I want to talk to you. And all of these fit into Messiah, depending on the three factors, the existence of a relationship between both the defendant and the informant and the government and the informant, the custody situation, the nature of the sort of inducements that the informant has to get information for the government. But in Messiah, the police wired up the guy. They did. Right, so I'm not, I'm not suggesting that there's an on-point Supreme Court precedent with this case, but what I'm saying is that you basically have all the indicia of a Messiah violation present and while it's a new set of facts, I'd suggest that the existing precedents do address it. If there's no further questions, thank you. Good morning, may it please the Court. Seth Kretzer for Appellant Initial. With the panel's permission, I would like to reserve two of my seven minutes for rebuttal. Yes. Okay. I'd like to put our arguments in context. The reason that we submit the testimony of Trooper Gajcik was so problematic is that this case, despite the evidence against Mr. Mitchell, which was one witness after another who said that he gave him drugs to turn around and sell, the evidence still presents the phenomenon of what I believe is often referred to as a dry drug case. By which I mean, despite the government's contentions that Mr. Mitchell was this major supplier in the relevant area, you still have the fact that nobody other than the people who were being paid in kind with drugs ever actually saw him with drugs. The government certainly didn't have surveillance video or photos or anything like that showing him with this massive amount of drugs that they say he distributed. We would submit that's what makes Trooper Gajcik's testimony so different. By which I mean, I reread the trial transcript yesterday. I think I counted six different drug-induced people, people who described themselves as in a haze or not being of their right mind, who testified that Mr. Mitchell compensated them in this way and got them to do these things. And then, of course, you had the first witness, this major crime figure who had come up from Connecticut but, of course, was trying to get a substantial 5K in regard to the death case that he had pending there. The only witness who actually came along to say with his own eyes, not on drugs, not trying to get a 5K motion, that he saw Mr. Mitchell engaged in this distribution activity was this Trooper Gajcik, who, of course, said he stopped the car and found the drugs in it and obviously saw them moving. Even though Mr. Mitchell's female companion were not arrested on that occasion, that's still the only point at which you have someone who could say not only they saw them moving the cocaine but could testify this is the crap cocaine. And that's why when this objection came up, and here I'm talking about the Rule 701 specific dimension of our objection, that we have to disagree with the government's contention that this was not properly objected to. Now, I can certainly see that a lesson of this case, defense lawyers around the circle would be well served to ask that objections apply with equal valence to both person when they're making these objections at trial. And yet, at least with regard to Trooper Gajcik, I don't think that's what can be said. Hasn't that ship sailed? You have to make your own objections, and your defense counsel for your client didn't make any objection. He did, Your Honor. I'm looking at starting at page 576. It was Mr. Roadway, my client's attorney, who originally said, Judge, may we approach, and both counsel went up to the bench, and my client's lawyer started with this objection about the lab test. He was the first one to bring that up and make that part of his objection. True, then Mr. Bourget, Mr. Ocean's trial counsel, made his own objection, but on page 580, the district judge specifically said, Your objections, in the plural, are noted for the records. He was clearly referring to the arguments that had been made by both men there at the counsel table. And then just a couple pages later, when the government moved to introduce Exhibit 36, this is the picture that Trooper Gajcik had taken of the contraband he found at the house, at the car, after it was impounded and searched. Both parties joined in the objection. Mr. Bourget objected, and my client's attorney specifically said, I join the objection. So both parts of the testimony of Trooper Gajcik, at the very beginning, in the middle, at the following, when they went to introduce the actual physical exhibit, that objection was clearly made by both people, both defense lawyers. And I think the district judge said as much. It was a 701 objection, wasn't it? Yes, that's a 701 part of the objection, so I wanted to address that. And then, of course, we have the nuance in this case, which perhaps there's not a case exactly on point, but we would argue the doctrinal implications of Bull Cumming, the cases, like the Ramos-Gonzalez case of this circuit, talk about the problem, the difficulty, when these lab tests are referred to in some way, be it usually when the government moves to introduce these lab tests, but alternatively we would argue when the defense is necessary for them to cross-exam on these lab tests, when the person, the expert, the lab chemist, usually, who performed the test, isn't there. How do we deal with that? In Ramos-Gonzalez, this court said... Doesn't it help? As I understand it, elicited from the officer is the fact that he does believe a lab test was done, and he doesn't know the results. I would think that's a bingo for defense counsel, because you've now established to the jury that there was a lab test, but the government witness hasn't put the results in, which raises some pretty substantial inference that maybe the lab test was problematic, particularly since he doesn't know what the result was. I'll get you the exact page size when I come up on my rebuttal, but as my understanding, I'll get you the exact quote, so I'm not speaking outside the record. Schubert Gates was very equivocal about this, and he changed his testimony as it went on. At first he was sure there wasn't a lab test, then he said, in fact, there must have been, it was five years earlier. Wasn't that on cross? Yes, it was on cross, yes. So how do you get up and ask questions on cross about the lab test, and then ask that the trial be reversed because those questions were answered? Well, the problem isn't that the questions were answered. The problem is that whatever the results of the test were, and I think by the premise of your question, you asked me if the true Brigadeship was speculating. The problem is we still don't have the actual person who performed the test, so under your logic, Judge Cauda, if you ask me, it doesn't actually help the defendant that the jury heard about these lab tests. Well, unless I can bring the person who performed the lab test, how do I know which way the lab test came out, what the veracity of it was, what the testability of it was? Perhaps that lab test came out completely opposite of the agent that's now saying he cannot remember it five years after the fact. I'll get you those exact page sites when I come back for rebuttal. It sounds like a good closing. But, well, yes, but also, no doubt, we would submit a 701 slash confrontation clause argument as well. Thank you. If anyone's looking for seats, there are plenty right in front of the bar. Good morning, Your Honor. May I please support Rainer Bunker on behalf of the United States? I'll start with Ocean and the ample evidence that supported the jury's verdict, guilty verdict, that Ocean joined with a charged conspiracy. We had Rainer's testimony that when he got to the Petronius to start distributing the crack with Mitchell, that the arrangement was that for every five grams Petronius sold, that she would get one on commission, and that Ocean was there, too, and that they had the same agreement with Ocean. Petronius' testimony confirmed as much, that she had this compensation arrangement with Mitchell and Ramirez, and that she knew that Ocean was doing the same thing that she was. We have Ramirez's testimony about fronting. He testified twice about that, Government's Appendix 18-19 and Government's Appendix 90-92, that he then started dealing the crack cocaine through Ocean and Petronius. That their customers would place the orders through Ocean and Petronius. He'd give them the crack. They'd go make the deliveries and bring back the money. We also have Petronius' testimony when the price went from $100 to $75 when Mitchell lowered the price to up the clientele. That was advantageous to everybody. Everybody got to keep a little bit more. Petronius' testimony confirmed as much. She said, sometimes I got crack, sometimes I got it for $80 and made $20 off of the gram. How do we draw the line, and maybe there isn't a universal way to do it, but how do we draw the line between someone who's essentially an independent contractor dealing with the conspiracy and someone who's actually in the conspiracy as part of it? What do we look at to draw that line? The compelling trial evidence, where I think some of your questions to the appellant went, is the evidence was here. I find the argument that Ocean was somehow a more efficient or effective local dealer, he admits he was a crack dealer, because he was able to successfully prevent appropriation of his clients to direct sales to Mr. Ramirez. That seems somewhat odd. He did so by keeping his own customers closely held. By doing that for a year and a half by his own admissions, what Ocean did was he secured and ensured the continuity of his very important role as middleman in this operation, not as some sort of independent contractor. He's the middleman, as he admitted during his interview with the agents, and he secured that interdependent role as middleman between Ramirez and his own closely held customers, and not just a one-off buyer-seller, but over the course of about a year and a half. I think that's some of that, and when you add to the fact that it's not Ocean pooling his money and going with a bunch of other addicts, it's Ocean using his connections to the higher members of this conspiracy, Ramirez and at times P, who is Christian Turner of Pistols, to again secure his important role as the go-between between and within the conspiracy, selling the conspiracy's crack to his closely held customers. And along those lines, I'd also point out that take a look at, of course, all of the testimony, but there are three people who testified the evidence that Ocean was not only the bottom-level trafficker, but at times he was also selling to other middlemen and middlewomen within the organization. Look at Bryn McLeod's testimony, Jeremy Ingersoll's testimony, and Burt Lamar's testimony, because Bryn McLeod justified that when she started doing crack, she got it first to Christina Demers, who was getting it from Ocean, and then ultimately Bryn McLeod could get it directly from Ocean and Ramirez. That's how this worked. And then we heard Jeremy Ingersoll's testimony, you'll read it, it's in the government's appendix, where he bought crack from Ocean to feed his own addiction, unfortunate as that is, and that he made money to buy the crack by selling it to his own people. So again, you have Ocean selling to a middleman, who's then selling to another end-user. And similarly, Burt Lamar's testimony, he's the gentleman who came from California, came to me, his addiction to crack came back in. He first bought from Shells, who was buying from Ocean, and again, then you have Shells acting as the middlewoman under those circumstances. So your point there, Ms. Bunker, is that Ocean did to others what was done unto him, and that therefore connects him and makes him interdependent into this? Yeah, I think that's a bit of irony, how much he complains about how the operation worked, because that's just how this worked. But by no means, I think the larger point is that Ocean, by concertedly making sure and locking in his role as middleman, keeping that distance, whether it's because, as Tony put it, he didn't want to bring the heat to my house, or for a variety of reasons, he wanted to maintain his important role in this drug conspiracy, so that for a year and a half, he could continue to distribute to his customers and maintain his own supply of crack cocaine. So unless the court has questions on that, I'll move to the Messiah issue. There are three significant problems with Ocean's Messiah claim. One, that Tony was at no time a government agent. Two, the government played no role whatsoever in Ocean's and Tony's self-initiated conversations. And three, the Supreme Court case law and this court's case law make clear that these facts don't make out a Messiah claim. Ocean seems to suggest that the mere fact that the government gave Tony immunity somehow made her a government agent. And I have found no case law to that effect, and nor has Ocean cited any. In fact, the Wallace opinion that we cite, that the immunity agreement merely gave her immunity from her truthful statements to the grand jury or to the government or to the court, said nothing about cooperation. She had no cooperation agreement. She was never told to go get information. And the Wallace opinion made clear not only that at least in the First Circuit, like in the Second and the Eighth, and I think the Ninth and D.C. Circuits, the person who converses with the represented defendant has to be enlisted for that purpose. At least there's that circuit split, but at least in the circuit and several others, it has to be a direct, the informant has to be directed to enlist incriminating statements from that defendant in particular. We certainly did not have that here, but what Wallace also noted was that they rejected, the court rejected the appellant's argument. The mere fact that Wallace had a plea and cooperation agreement there with the government somehow made the informant a government agent, and that's just not so for Messiah agency purposes. Nor in this case on these facts could we submit the court reasonably conclude that the government had any role in eliciting, let alone deliberately and designably eliciting, as this court has interpreted the Messiah and his progeny test to be. This statement's an issue here, where if you, first of all, during the Tonya's voir dire testimony to herself, she said six times, I've never been a government agent, I was not a government agent. She testified that the reason she went to go see Ocean, which was about two years after Ocean's arrest and about 18 months after her immunity, she said it was years, I think it's about a year and a half, was that she liked him, she cared about him. And she said, she testified that it, meaning her meetings, her earlier meetings years ago with government agents, it wasn't even on my mind when she went to talk with Ocean. And I think when you look at the transcripts that are in the appendix of those conversations, it's pretty obvious that Ocean is begging for Tonya to come visit and they are beginning to develop their defense strategy. And in fact, he's saying, has my lawyer called you yet? My lawyer's going to call you. We're going to set up the questions, good for you. So if anything, Tonya appears to be a defense agent and the government knew nothing about these conversations until a week before trial, during trial prep with another witness. And as for the, we agree, as Ocean suggests to the government, the affirmative obligation is for the government not to, the government can't deliberately elicit the incriminating statements. And that includes, you can't exploit, intentionally create a situation likely to elicit the incriminating statements or exploit a situation. But the situations described in the cases, I think Judge Torsten, you pointed out, in Messiah, it all involves prearrangement. In Messiah, the agent prearranged for the co-defendant to wear a body wire. In Henry, the agent prearranged for a paid informant to go into Henry's cell and then pay the informant for the information. In Moulton, the agent prearranged for again the co-defendant to wear a body wire. During a conversation, the purpose for which was to discuss different strategy. And in Coleman, the agent prearranged again to put an informant into Wilson's cell  And I note that the Supreme Court in Coleman even said that there, there was no Messiah claim because the agents and the informant did nothing more, took no action beyond their listening as is required. It took no action to deliberately elicit the incriminating statements from the counsel defendant. Here we didn't have any prearrangement. We had no scheme. We had no plot. We didn't even know about the conversations. We didn't put an ear in Mr. Ocean's cell. And we certainly didn't put a voice. And so that will submit. As for Mitchell, changing gears now, Judge Torreson, we agree the initial objection by Mr. Rodway on behalf of Mitchell was a rule 701 objection and it was purely foundational. Mr. Rodway said, I don't think this agent, this street trooper, with 10 and a half years experience is qualified to say that this is crack cocaine. The case law in this circuit is abundantly clear that experienced law enforcement officers, including lay opinion testimony by, for instance, Fern Dowling, a lifetime crack addict, is permissible. Law enforcement agents can give lay opinion testimony about the substances they personally seized. Here we have Trooper Gasek, 10 and a half years experience. He was the one who stopped Fern Dowling and Mitchell in that car coming back to Maine and identified, based on his training experience, what he thought were these several rocks of crack cocaine. And then Fern Dowling herself testified that I had made these trips with Mitchell before. We would bring back crack cocaine and, yes, the trooper seized crack on this occasion. Then we have Trooper Quintero, 7 and a half years of experience with Mr. Mitchell at the bus station up in Portland. And based on his training experience, he testified that this substance, I believe, was crack cocaine. And we, of course, have Mitchell's own admissions to Trooper Quintero during that stop, admitting that the substance in his bucket and down by his ankle that Quintero seized was crack cocaine. As for the confrontation clause, it is solely Ocean's attorney, and Ocean's attorney alone, who took those troopers down those bizarre... the crack... the very bizarre crack pipe colloquy that you'll read with the first trooper about, did you test the crack pipe? What did the lab... did you get a lab report? But the lab report did tell you that that was, in fact, a crack pipe. It was Ocean's attorney who elicited that entire line of questioning from first Gasek and then Quintero. It was Ocean's attorney who started talking about Maria Pease at the state lab in Maine. And Mitchell's attorney sat there and said nothing. When Ocean's attorney asked about Maria Pease, it was the government that objected on relevance ground. Then we get to that sidebar, yet another sidebar, and the most compelling thing that Mitchell's attorney said during that sidebar is when Judge Woodcock somewhat flabbergasted to learn that Mitchell had actually pled guilty in state court to possession of cocaine based on that 2013 bus station incident. That's when Mr. Rodway chimes in and agrees, confirms that his client had, in fact, pled guilty. But Mr. Rodway said, quote, people plead guilty all the time here to things without knowing things like scientific analysis. You just don't have to know that to plead guilty. And that's exactly our point in the district court and here on appeal, that this was a charge and the purpose of the evidence was to prove a conspiracy to distribute cocaine based. And the evidence from the troopers about what they happened to seize and coupled with, of course, Dowling's and all the other conspirators' testimony was corroborating evidence that Mitchell here conspired to distribute cocaine based. And this court's case law, the ones you've seen it, is probably most on point, makes clear that in a conspiracy charge the link between the drugs and the conspiracy can be proved in circumstantial evidence alone. So lab reports weren't necessary. The troopers didn't testify about lab reports and that whole line of questioning was elicited from Mr. Oshin's attorney without Mitchell's objection. With that, we'd ask that you affirm. I rebuttal to Ms. Bunker would begin and end, the first part of it, on page 579 of the record. I think this can be cleared up. Specifically, I have to respectfully disagree that Mr. Roadway only objected that Trooper Gajcik didn't have the experience to testify of the substance he found for crack cocaine. I'm reading a direct quote on the bottom of page 579, and the government's never given us any sort of lab report that I know of. And then he continued on to page 580. So, I mean, clearly, when Mr. Roadway objected, and he was the first one to object about Trooper Gajcik, he was talking about a lab report from the get-go. So I think there's no doubt that that can be resolved in the record. Can I correct that the lab report was not ever mentioned on direct? That's correct, yes. So, defense counsel themselves brought up the question of whether there was ever a lab report done. Yes. So, how is this, how, what are we even doing here? I don't understand the premise. I mean, wouldn't you have been able to call the chemist if you wanted the lab report in? Oh, yes, that's what I think shows the problem with what the government's approach was here. No one knew that there was a lab report. When the defense counsels were cross-examining this, Isn't that a totally different issue than the one raised? Well, I mean, I guess, Judge Horson, my question would be how else would defense counsels like Mr. Roadway cross-examine this agent? If you want to question this agent in his late capacity testifying as to the substance he believes is crack cocaine. Surely, no one disputes he's been there for 10 or 20 or many years he's been so employed. I think the question becomes how else would we cross-examine him? As Judge Kata asked me when I got it for originally, that would be the most powerful way is to cross-examine a lab report. I have the same question that Judge Torreson has. Did you please answer it? Yes, that they did not know about the defense lawyers had to basically ask in the dark would be my answer to your question. They did not know that there was a lab report. So you're talking about a pre-trial disclosure issue. It sounds like what you're saying is the problem here is prior to trial they didn't tell you there was a lab report. I don't think there's any dispute that prior to trial they didn't tell us there was a lab report. I'm not claiming that that's a Brady or Jiggly or any other sort of violation. If you're not challenging that, then what's left? Well, the only answer I can give you, Judge Kata, is that on page 588, 589 of the record, you can see where I was talking about initially that the trooper is all over the map as to whether or not he remembers the lab report, whether there was a lab report. Yes, there was. No, there wasn't. And that would be the sum and substance of my argument. Thank you.